UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

Jesse L. MARTIN                                                                                    PLAINTIFF

v.                                                        CIVIL ACTION NO. 3:17-CV-740-CRS

Dr. Kevin SMITH, et al.                                                    DEFENDANTS

**MEMORANDUM OPINION**

## I. Introduction

This case is before the Court on the Defendants' motion for summary judgment. DN 56. Plaintiff responded (DN 63) and Defendants replied (DN 68). Therefore, this matter is ripe for review. Finding that Plaintiff's claims fail on the merits, the Court will grant the motion for summary judgment on all claims remaining in the complaint.

## II. Factual Background and Procedural History

At all times relevant to this lawsuit, Plaintiff Jesse L. Martin was a pretrial detainee at the Louisville Metro Department of Corrections ("LMDC") in Jefferson County, Kentucky. He claims that he was not provided proper medical treatment by Defendants—Dr. Kevin Smith and Nurse Brenda Junk[1]—during his detention, giving rise to his claims of negligence and a Fourteenth Amendment violation. Specifically, he claims Smith had scheduled an x-ray that was not conducted, that he was subjected to a colonoscopy when he was supposed to receive an esophagogastroduodenoscopy ("EGD"), that he was treated by nurse practitioners instead of doctors, that there was a delay in responses to his health service requests, and that employees were not properly trained.

---

[1] Smith and Junk are employed by Correct Care Solutions, LLC ("CCS"), a private company that provides healthcare services in prisons and jails.

1

In response, Defendants have produced Martin's medical records. *See* DN 54 (sealed). The Defendants summarize the pertinent medical entries chronologically. DN 56 at 3–6. Martin does not object to the accuracy of this recitation or the records themselves. Having reviewed Martin's entire medical record, the Court adopts the Defendants' recitation (with minor edits for clarity) as representing the undisputed history of Martin's medical treatment while at LMDC:

> Jan. 13, 2017: Martin submitted a Healthcare Request form indicating "acute abdomen pain is not getting any better. In alot [sic] of pain." The triage nurse noted that Martin was scheduled to see the doctor on January 24, 2017. DN 54 at 10.
>
> Jan. 19, 2017: Nursing evaluated Martin due to complaints of acute abdominal pain made on January 13, 2017. The nurse noted that Martin was scheduled for an appointment with the doctor on January 24, 2017, but that she would follow-up with the doctor on call regarding Martin's condition. *Id.* at 11.
>
> Jan. 24, 2017: Martin is evaluated by Dr. Smith with complaints of groin pain and pain with urination. Dr. Smith noted that Martin made "no mention of rectal bleeding" and was not in distress. Dr. Smith took vitals, ordered lab work and advised Martin to follow-up in two weeks. Dr. Smith also advised Martin that he would obtain Martin's records from his recent ER visit to the University of Louisville ("UofL") hospital. Martin's weight was documented at 160 lbs. *Id.* at 12.
>
> February 28, 2017: Martin is re-evaluated by Dr. Smith, who noted that Martin reported a 5–6 month history of nausea and vomiting and occasional rectal pain. Dr. Smith noted that he received Martin's UofL records and that they revealed "no significant abnormal findings." Dr. Smith noted Martin was in no distress, but looked pale. A urine sample was normal. Dr. Smith noted that, in spite of the purported vomiting, Martin's weight had been stable at 160 lbs. for one month. Dr. Smith ordered Zofran (a drug used to prevent nausea and vomiting) and testing including a complete blood count, comprehensive metabolic panel, and an x-ray of his kidneys, ureters, and bladder. He advised Martin to return in two weeks for a genitourinary/rectal examination. *Id.* at 13–14.
>
> March 10, 2017: Martin submitted a Healthcare Request form indicating that his medications were not working and that he still has acute abdominal pain. The triage nurse placed a call to the provider for new orders and referred him to the physician. *Id.* at 15.
>
> March 11, 2017: Martin is evaluated by the gastroenterology clinic. He is noted to be constipated, with a soft, distended abdomen. He is noted not to have gastroesophageal reflux disease, but instead, an inguinal hernia. Martin was prescribed Bisacodyl for constipation and referred to the provider. *Id.* at 16–25.

March 14, 2017: Martin was again evaluated by Dr. Smith for GU/rectal exam and to discuss lab work, which was normal. Martin indicated his nausea and vomiting was resolving and Dr. Smith noted that his weight was stable (even increasing) at 163 lbs. Dr. Smith ordered iron, ferritin (iron testing), repeat lab work, repeat rectal exam and consider colonoscopy. Martin was scheduled for follow-up in four weeks. *Id.* at 25–26.

April 11, 2017: Martin refused to attend his follow-up appointment with Dr. Smith. *Id.* at 27–28.

April 20, 2017: Martin submitted a Healthcare Request form to medical with complaints of acute abdominal pain. The triage nurse noted that Martin missed two separate doctor's appointments, but would schedule an appointment for a third time. *Id.* at 29–30.

May 30, 2017: Martin is evaluated by RN Marvanna Juberg who noted that Martin had abdominal pain and difficulty keeping food down. The RN referred Martin to the medical provider. *Id.* at 31–32.

June 27, 2017: Martin is evaluated by APRN Pamela Taylor with complaints of abdominal pain and difficulty keeping food/liquids down. APRN Taylor referred Martin to a gastrointestinal ("GI") specialist. *Id.* at 33–34.

July 4, 2017, July 13, 2017: Martin submitted Healthcare Request forms indicating his continued complaints of difficulty keeping food down and occasional pain. The triage nurse informed Martin that he had a scheduled GI appointment coming up (she could not tell him when due to safety concerns); Martin did not want to be seen regarding his complaints. *Id.* at 35–37.

July 28, 2017: Martin submitted a Healthcare Request form regarding rash on his shoulders and chest. The triage nurse evaluated Martin and diagnosed him as having hives. Martin was prescribed hydroxyzine. *Id.* at 38–40. Martin refused to take the hydroxyzine as prescribed on two occasions. *Id.* at 41–42.

August 4, 2017, August 16, 2017: Martin submitted Healthcare Request forms related to his complaints of stomach and groin pain and not being able to keep liquids down. The triage nurse informed Martin that he has an appointment with an off-site GI specialist in October for this issue and that the appointment was made on 6/27/17. *Id.* at 43–44.

September 8, 2017: Martin submitted a Healthcare Request form related to high blood pressure. Martin was evaluated by the nurse who indicated his blood pressure was elevated. She called the doctor and Dr. Smith ordered that Martin's blood pressure be checked every day for five days and noted that Martin had an upcoming doctor appointment on September 12, 2017. *Id.* at 45–47.

September 9, 2017, September 12, 2017: Martin refused to have his vitals taken per order. *Id.* at 48–49.

3

September 15, 2017: Martin is evaluated by Nurse Kathy Murphy, LPN for continued abdominal pain. Nurse Murphy noted that Martin's vitals were stable and that he was in no acute distress. Nurse Murphy notified the doctor for further advisement and orders. *Id.* at 50.

October 3, 2017: Martin is seen by UofL Physicians Gastroenterology for an initial consultation. The gastroenterologist prescribed a higher dose of omeprazole and requested an additional complete blood count, ferritin testing and an EGD. He requested follow-up in three months. *Id.* at 54–57.

October 9, 2017: UofL Physicians faxed orders for Martin's EGD prep, which included directions to "take as directed for colonoscopy." EGD scheduled for 11/17/17 at UofL Hospital. *Id.* at 55–56, 61.

November 17, 2017: EGD performed. *Id.* at 61.

November 30, 2017: Martin seen by Dr. Smith to discuss results of EGD. Dr. Smith noted that ulcers/erosions were seen. Martin noted that he was doing better on the current dose of omeprazole and that his appetite is good. Dr. Smith noted that Martin's weight is stable, but "definitely lower than this point last year" (current weight 158, weight last year, 160). Dr. Smith noted that Martin was angry that he had to do a bowel cleanse when he only had an EGD and not a colonoscopy. Dr. Smith noted that Martin also underwent a gastric emptying study and the results were pending. Martin appeared in no distress. Dr. Smith continued Martin's omeprazole, ordered a snack for 30 days and ordered a follow-up appointment for about three weeks to determine if further GI clinic follow-up is needed. *Id.* at 62–63.

December 14, 2017: follow-up appointment with Dr. Smith. Martin is noted to be in no distress and with a slight weight gain. Dr. Smith ordered follow-up for three weeks. *Id.* at 64–65.

January 4, 2018: Martin refused his rectal exam. *Id.* at 66.

DN 56 at 3–6 (summarizing Martin's pertinent medical history).

On initial review pursuant to 28 U.S.C. § 1915A, the Court dismissed all claims except "(1) the Fourteenth Amendment claims of deliberate indifference to a serious medical need against Defendants Dr. Smith in his individual and official capacities and against Defendant Junk in her official capacity; and (2) the state-law negligence claim against Defendant Dr. Smith." DN 9 at 3–4. Defendants move for summary judgment on those claims.

## III. Legal Standard

A party moving for summary judgment must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A genuine issue for trial exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*. In undertaking this analysis, the Court must view the evidence in a light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

The party moving for summary judgment bears the burden of establishing the nonexistence of any issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). They can meet this burden by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the . . . presence of a genuine dispute." FED. R. CIV. P. 56(c)(1). This burden can also be met by demonstrating that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## IV. Discussion

Defendants' motion for summary judgment argues that Martin's claims should be dismissed because Martin failed to properly exhaust his administrative remedies before bringing his § 1983 claim and that the claims fail on the merits. The Court addresses each in turn, concluding that a genuine issue of material fact exists as to whether Martin exhausted his

5

administrative remedies but, regardless, that Martin's claims fail on the merits and summary judgment in favor of Defendants is appropriate.

### A. Exhaustion

The Prison Litigation Reform Act ("PLRA") requires that prisoners challenging the conditions of their confinement exhaust available administrative remedies. 42 U.S.C. § 1997e(a). Exhaustion under the PLRA requires "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits.)'" *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (citing *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)) (emphasis in original). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90–91.

Defendants assert that "[i]t is the plaintiff's burden to prove exhaustion of administrative remedies with respect to each claim ***and each defendant***, either by attaching copies of documents therefrom or by describing with particularity the administrative steps he took and the responses received." DN 56 at 7 (emphasis in original). For that proposition, they cite *Brown v. Toombs*, 139 F.3d 1102, 1104 (6th Cir. 1998). However, Brown's holding on that issue was *explicitly* abrogated by the Supreme Court in 2007. *Jones v. Bock*, 549 U.S. 199, 212 (2007). *See also Id.* at 204, n.2 (citing to *Brown* before abrogating its holding). In *Jones*, the Court bluntly held "that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Id.* at 216. Therefore, "[w]hen the defendants in prisoner civil rights litigation move for summary judgment on administrative exhaustion grounds, they must prove that no reasonable jury could find that the

6

plaintiff exhausted his administrative remedies." *Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017) (citing *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012)).

While proving a negative certainly gives pause, it is important to remember the relative positions of the parties in these cases. As the Third Circuit has recognized, "it appears that it is considerably easier for a prison administrator to show a failure to exhaust than it is for a prisoner to demonstrate exhaustion." *Ray v. Kertes*, 285 F.3d 287, 295 (3rd Cir. 2002) (cited with approval in *Jones*). These officials "are likely to have greater legal expertise and, as important, superior access to prison administrative records in comparison to prisoners." *Id.* (citation omitted). Further, "[p]rison officials and their attorneys can also readily provide the court with clear, typed explanations, including photocopies of relevant administrative regulations." *Id.* "Pro se prisoners will often lack even such rudimentary resources." *Id.*

Defendants consistently argue that Martin did not produce evidence that he exhausted his administrative remedies. *See* DN 56 at 8 ("[t]here is no evidence that Plaintiff ever grieved [the inadequate medical treatment] issue as it relates to Dr. Smith or that the issue was exhausted."); *Id.* ("Plaintiff submitted no evidence that this issue was grieved as against Nurse Junk or CCS or that it was exhausted per the requirements of the PLRA."). That burden is not his. Rather, it is Defendants who have submitted no evidence to carry *their* burden. Though not required of him, Martin produced some documents in response indicating he at least attempted to grieve some issues. DN 62-1 at 2–6. At a minimum, a genuine issue of material fact regarding exhaustion exists and summary judgment is improper on that ground.

    **B.**    **Individual Capacity Claims Against Dr. Smith**

The Fourteenth Amendment forbids prison officials from "unnecessarily and wantonly inflicting pain" on a pretrial detainee. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Bell v.*

7

*Wolfish*, 441 U.S. 520, 545 (1979) (protections extended to pretrial detainees via Fourteenth Amendment). An official violates this command when they act with "deliberate indifference to serious medical needs" of an inmate or detainee. *Estelle*, 429 U.S. at 106. As a result, there is an objective component and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

The objective component requires the existence of a "sufficiently serious" medical need. *Id.*; *Estelle*, 429 U.S. at 104. A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004).

The subjective component requires an inmate to show that prison officials have a "sufficiently culpable state of mind" in denying medical care. *Farmer* 511 U.S. at 834. "In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. "To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

"Where a prisoner alleges only that the medical care he received was inadequate, 'federal courts are generally reluctant to second guess medical judgments.'" *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). Courts will generally only venture there where the medical treatment is "so woefully inadequate

as to amount to no treatment at all." *Id.* (quoting *Westlake*, 537 F.2d at 860 n.5). Where the complaint is of a delay in treatment, rather than complete denial, the detainee "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Blackmore*, 390 F.3d at 898 (quoting *Napier v. Madison Cty, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001)).

Martin's records indicate that he was seen extensively by healthcare staff during his detention at LMDC. After every Healthcare Request form Martin submitted, he was evaluated by a healthcare professional, often receiving additional follow-up evaluations.[2] During that time repeated testing of various sorts was ordered.[3] Medication was repeatedly ordered.[4] Martin was even sent off-site to receive treatment by a GI specialist at UofL.[5] Several times, it was Martin who refused to participate in his medical treatment.[6] With those uncontroverted facts, no reasonable juror could conclude that Smith and Junk were deliberately indifferent to Martin's

---

[2] *See* DN 54 at 11–14 (evaluation and re-evaluation following January 13, 2017 request); *Id.* at 16–26 (evaluation and re-evaluation following March 10, 2017 request); *Id.* at 29–34 (evaluation following April 20, 2017 request and rescheduling of appointments cancelled as a result of Martin refusing to attend); *Id.* at 35–37 (discussing scheduled GI appointment and offering evaluation following July 4, 2017 and July 13, 2017 requests); *Id.* at 38–40 (evaluation following July 28, 2017 request); *Id.* at 43–44 (reminder of off-site GI specialist appointment following August 4, 2017 and August 16, 2017 requests); *Id.* at 45–47 (evaluation following September 8, 2017 request); *Id.* at 50 (evaluation on September 15, 2017 to follow-up); *Id.* at 64–65 (follow-up appointment with Dr. Smith after EGD).
[3] *See* DN 54 at 12 (Smith took vitals, ordered lab work, and advised Martin he would obtain his UofL medical records); *Id.* at 13–14 (Smith received and reviewed Martin's UofL records, took a urine sample, and ordered testing including a complete blood count, comprehensive metabolic panel, and an x-ray of his kidneys, ureters, and bladder); *Id.* at 25–26 (Smith orders iron, ferritin, repeat lab work, repeat rectal exam, and considers colonoscopy); *Id.* at 45–47 (Smith orders Martin's blood pressures checked every day for five days); *Id.* at 54–57 (UofL gastroenterology orders additional complete blood count, ferritin testing, and an EGD); *Id.* at 55–56, 61 (UofL gastroentegology sends orders for Martin's EGD prep).
[4] *See* DN 54 at 13–14 (Smith ordered Zofran for Martin's nausea and vomiting); *Id.* at 16–25 (Martin is prescribed Bisacodyl for constipation); *Id.* at 38–40 (Martin is prescribed hydroxyzine for hives); *Id.* at 54–57 (UofL gastroenterology prescribed a higher does of omeprazole); *Id.* at 62–63 (Smith continues Martin's omeprazole ordered by UofL).
[5] *See* DN 54 at 54–57 (evaluation by GI specialist at UofL Physicians Gastroenterology following repeated GI complaints); *Id.* at 61 (EGD performed by UofL); *Id.* at 62–63 (Smith discussed results of EGD with Martin)
[6] *See* DN 54 at 27–28 (Martin refuses follow-up on April 11, 2017); *Id.* at 35–37 (Martin declined evaluation); *Id.* at 41–42 (Martin twice refused to take his prescribed hydroxyzine); *Id.* at 48–49 (Martin refused to have his vitals taken per Smith's order); *Id.* at 66 (Martin refuses rectal exam).

medical needs. At worst, Martin disagreed with the treatment he received. Such disagreement is insufficient to support a § 1983 claim.

### C. Official Capacity Claims Against Dr. Smith and Nurse Junk

When a § 1983 complaint names employees of a private corporation in their official capacity, the claim is one against the private corporation employer. *Griffin v. S. Health Partners, Inc.*, No. 1:12-CV-P174-M, 2013 WL 530841, at *5 (W.D. Ky. Feb. 11, 2013). "[A] private entity which contracts with the state to perform a traditional state function such as providing medical services to prison inmates may be sued under § 1983 as one acting 'under color of state law.'" *Id.* (quoting *Hicks v. Frey*, 992 F.2d 1450, 1458 (6th Cir. 1993) (additional citation omitted)). However, "[a] private corporation, . . . 'is not liable under § 1983 for torts committed by its employees when such liability is predicated solely upon a theory of respondeat superior.'" *Id.* (quoting *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999)). "Rather, a private corporation is liable under § 1983 only when an official policy or custom of the corporation causes the alleged deprivation of federal rights." *Id.* (citing *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 817–18 (6th Cir. 1996)).

In this case, Martin has failed to plead, argue, or produce any evidence that he was subject to a deprivation of federal rights pursuant to an official policy or custom of CCS. As already discussed, every indication is that Martin received adequate medical treatment. Even assuming *arguendo* some violation by Smith or Junk, Martin has adduced nothing regarding any policy or custom of CCS which contributed to a violation.

### D. Associated State-Law Claims

"A plaintiff bringing a medical negligence claim in Kentucky must establish three elements: breach, causation, and injury." *Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. Ct. App.

10

2006). Assuming injury *arguendo*, Martin's claim fails on the other two prongs. As to breach, for the same reason discussed above, the Court is of the opinion that no reasonable juror could conclude that Smith breached any duty he had toward Martin. Martin was given adequate, prompt, and continuous medical treatment.

Further, Martin cannot prove causation. In this sort of medical negligence case, a plaintiff is required to produce an expert to testify regarding causation "because the nature of the inquiry is such that jurors are not competent to draw their own conclusions from the evidence without the aid of such expert testimony." *Baylis v. Lourdes Hosp., Inc.*, 805 S.W.2d 122, 124 (Ky. 1991).[7] This rule applies even to inmates and pro se litigants. *See Stokley v. Christian Cty. Jail*, No. 5:15-CV-130-TBR, 2017 WL 119480, at *4–5 (W.D. Ky. Jan. 11, 2017) (granting summary judgment against pro se inmate because he did not produce a medical expert to demonstrate causation for his negligence claim against jail doctor); *Ford v. Summers*, No. 6:17-224-DCR, 2018 WL 2024616, at *4 (E.D. Ky. May 1, 2018) (same). Without such an expert, a reasonable jury cannot conclude that any action or inaction by Smith caused injury to Martin.

## V.     Conclusion

Our Constitution prohibits prison officials from unnecessarily and wantonly inflicting pain on inmates and pretrial detainees by acting with deliberate indifference to their serious medical needs. No reasonable juror could conclude that Dr. Smith and Nurse Junk did so in this case. Instead, the undisputed evidence demonstrates that Martin received adequate, prompt, and

---

[7] Exceptions exists for situations "where the common knowledge or experience of laymen is extensive enough to recognize or infer negligence from the facts," where "the particular injury is a kind that a jury could reasonably find would not occur in the absence of negligence" (i.e. *res ipsa loquitur*), or "where the evidence reasonably established a causal connection between the alleged negligence and the injury." *Baylis*, 805 S. W.2d at 124 n.3 (citations omitted). None of those are applicable here.

11

continuous medical treatment. As a result, Smith and Junk are entitled to summary judgment, which the Court will grant.

A separate order will be entered in accordance with this opinion.

July 12, 2019

**Charles R. Simpson III, Senior Judge**
**United States District Court**